**Michael D. BAUER, Appellant,**

v.

**Diana Lynn BAUER, Respondent.**

**No. WD 57671.**

Missouri Court of Appeals, Western District.

Feb. 20, 2001.

---

Marilyn M. Shapiro, Russell L. Powell, Kansas City, for Appellant.

Elvin S. Douglas, Jr., Meryl L. Lange, Raymore, for Respondent.

Before SPINDEN, C.J., and EDWIN H. SMITH and NEWTON, JJ.

EDWIN H. SMITH, Judge.

Michael D. Bauer appeals the judgment of the Circuit Court of Cass County dissolving his marriage to the respondent, Diana Lynn Bauer, with respect to the court's awards of child custody, attorney's fees, and property.

The appellant raises four points on appeal. In Point I, he claims in five sub-points that the trial court erred in awarding the respondent primary physical custody of three of the parties' four minor children because it was "against the weight of the evidence, not supported by substantial credible evidence, contrary to law, and an abuse of discretion." In Point II, he claims that the trial court erred in awarding the respondent $10,000 of the $32,000 in attorney's fees she incurred because, in doing so, it failed to

consider, as required, the respondent's financial resources to pay her own attorney's fees, and her conduct during the marriage and the dissolution proceeding. In Point III, he claims that the trial court erred in awarding him his non-marital property, as required by § 452.330,[1] because in doing so it misapplied the law found in that section, and its award was against the weight of the evidence. In Point IV, he claims that the trial court erred in awarding him his marital property, as required by § 452.330, because in doing so it misapplied the law found in that section, and its award was against the weight of the evidence.

We affirm in part, and reverse and remand in part.

### Facts

The parties were married on May 1, 1980. There were four children born during the marriage: Stacey Anne Bauer, born October 7, 1980; Rachel Renae Bauer, born September 6, 1985; Michael Len Bauer, born May 28, 1992; and Bradley Michael Bauer, born August 24, 1995.

Prior to the marriage, both parties were employed. In 1977, the parties opened a joint savings account, with each party contributing to it from his or her earnings. During the marriage, the appellant continued to work, putting in long hours at the family construction and property management business. The respondent worked outside of the home on a limited basis, but mainly acted as a homemaker and caregiver to the children. She sometimes helped the appellant in the business by running errands, buying materials and supplies, helping in the office, and keeping the books. The parties eventually amassed property with a net value of over $5,000,000.

Problems beset their marriage from the beginning. The appellant worked long hours, and the respondent used drugs periodically, mainly methamphetamines.

Eventually, on August 5, 1997, the appellant sought and received an *ex parte* order of protection against the respondent, which excluded her from the marital residence. During this time, the children remained in the custody of the appellant, who only allowed the respondent to see them twice between August 5 and December 27, 1997, when the court entered an order granting her supervised visitation.

The appellant filed his petition for dissolution of marriage on August 7, 1997, requesting, *inter alia*, that the marriage be dissolved, that he be awarded sole custody of the children, that the respondent be awarded reasonable visitation, that the parties' property be divided equitably, and that each party's non-marital property be set aside to him or her. The respondent filed her answer and counter-petition on August 20, 1997, requesting, *inter alia*, sole custody of the children, with the appellant to receive reasonable visitation, an award of child support, an award of maintenance, an equitable division of the parties' marital property and debts, and an award of attorney's fees.

Near the end of August 1997, the respondent began cohabitating with David McKnight. McKnight had previously been convicted of receiving stolen property, for which he had served three years in prison. Approximately one week before the trial began, McKnight moved out of the respondent's home, as the respondent felt that it was "in the children's best interest that they live separately."

On August 22, 1997, the respondent filed a motion for temporary custody, child support, maintenance, and attorney's fees, which was heard on October 16, 1997. The court denied the respondent's motion as to temporary custody and instead awarded temporary custody of the children to the appellant. The court, however, awarded the respondent temporary maintenance of $2,500 per month and temporary attorney's fees of $2,375.

---

1. All statutory references are to RSMo Supp. 1998, unless otherwise indicated.

On November 18, 1997, the respondent filed a second motion for temporary custody or, in the alternative, for temporary visitation. On December 15, she filed a motion for additional temporary attorney's fees and suit money. The appellant filed a motion to compel the respondent to submit to a physical examination on December 22. The motions were consolidated for hearing on December 23. The respondent's motion for temporary custody was denied, but she was granted temporary supervised visitation with the children. In addition, the court ordered the respondent to submit to drug testing by providing a hair sample.

On July 1, 1998, the parties filed a joint motion for the appointment of a guardian *ad litem* (GAL), which was granted, with Sharon Westhoff being appointed. The GAL requested a second drug test of the respondent, which was ordered. The test was conducted on August 12, 1998.

The case was tried before the Honorable Thomas M. Campbell who heard evidence on September 8–11, and on October 6, 1998. Both parties presented substantial evidence concerning the misconduct of the other spouse during the course of the marriage. In this regard, the appellant presented extensive evidence concerning the respondent's drug use. Dr. Harold Brown, a psychologist specializing in substance abuse, conducted various tests on the respondent. He testified that the results of the tests indicated that the respondent had most likely not been using addictive drugs in the previous three to four months and may have been drug-free for over a year. Furthermore, the test results indicated that the respondent did not have a drug dependence profile and showed a low pathological risk of a need for drug treatment. However, he did state he felt that she was minimizing her previous drug use and that people who use methamphetamines, such as the respondent, are at a high risk of relapse due to the highly addictive nature of the drug. Dr. Michael Robertson, the forensic toxicologist who conducted the analysis of the respondent's hair specimen, testified that the test indicated multiple uses of methamphetamines from two and one-half to five months prior to the date the sample was taken, which was in December 1997.

Preston Washington, the clinical director for the National Council on Alcoholism and Drug Dependency in Kansas City, Missouri, testified, based on his interviews of the respondent and the results of two tests which he administered to her, that she did not require drug intervention or enrollment in a substance abuse program. He saw no signs or symptoms of drug problems during the past year. Further, he saw no evidence that the respondent was attempting to skew the test results or that she was less than honest about the level of her past drug use.

The court interviewed all four of the parties' children. The boys were interviewed together, but the girls were interviewed separately. Rachel stated that she wanted to live with her mother. Stacey stated that she wanted to live with her father. She also testified that, in her opinion, the boys should live with their father and Rachel with their mother.

The GAL testified that, based upon her investigation, it was her opinion that both parties had problems. As to the respondent, the GAL felt that she minimized her drug use. As to the appellant, the GAL felt that he refused to admit that he had any shortcomings and that he did not effectively parent the children nearly as much as he thought he did. Her recommendation was that the parties receive joint legal and physical custody of the children.

Having taken the case under advisement, Judge Campbell declared a mistrial on November 9, 1998, and recused himself from the case. The matter was then assigned to the Honorable Mary Ellen Young on November 17, 1998. The appellant filed an application for a change of judge on December 8, 1998, which was granted. The case was then assigned to

the Honorable Stephen W. Angle on December 14, 1998. On January 5, 1999, the respondent filed an application for a change of judge, which was sustained. Accordingly, on January 12, 1999, the matter was assigned to the Honorable Joseph P. Dandurand, who obtained a stipulation from the parties that he could decide the case based solely upon the record in the case.

On July 23, 1999, the court entered its judgment dissolving the marriage. In its judgment, the court also: (1) awarded joint legal custody of all four children to both parties, with primary physical custody of Stacey Bauer to the appellant and primary physical custody of Rachel, Mikey, and Bradley Bauer to the respondent, with scheduled visitation to the appellant; (2) ordered the appellant to pay the respondent $1,200 per month in child support; (3) divided the marital and non-marital property; and (4) awarded the respondent $10,000 in attorney's fees. On August 16, 1999, the appellant filed a motion to amend the judgment, which was denied on August 24, 1999.

On September 22, 1999, the appellant was granted leave of court to file his appeal out of time. His notice of appeal was filed on October 1, 1999.

## Standard of Review

Provisions in a divorce decree will be affirmed unless there is no substantial evidence to support them, they are against the weight of the evidence, or the trial court erroneously declares or applies the law. *Woolridge v. Woolridge,* 915 S.W.2d 372, 375 (Mo.App.1996) (*citing Hoffmann v. Hoffmann,* 676 S.W.2d 817, [822] (Mo. *banc* 1984); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. *banc* 1976)). Substantial evidence is competent evidence from which the trial court could reasonably decide the case. *Wallace v. Van Pelt,* 969 S.W.2d 380, 382 (Mo.App.1998). " 'Weight of the evidence' means its weight in probative value, not the quantity or amount of evidence. The weight of the evidence is

not determined by mathematics, but on its effect in inducing belief." *Waddell v. Dir. of Revenue,* 856 S.W.2d 94, 95 (Mo.App. 1993) (citation omitted).

## I.

In Point I, the appellant claims in five subpoints that the trial court erred in awarding the respondent primary physical custody of three of the parties' four minor children because it was "against the weight of the evidence, not supported by substantial credible evidence, contrary to law, and an abuse of discretion." In subpoint A, he claims that the trial court erred in entering its judgment in that the circuit judge who entered the judgment did not hear the testimony and evidence in the case and was, therefore, not afforded an opportunity to judge the credibility of the witnesses, which was absolutely necessary to the entry of the court's judgment. In the remaining four subpoints, he claims that the trial court's award of child custody was against the weight of the evidence in that the court did not give sufficient weight: "(B) ... to the drug use of the respondent as related to character and morals and the decision to place three (3) children with respondent ...; (C) ... to the fact that respondent was co-habitating with a convicted felon ...; (D) ... to the recommendation of the guardian ad litem; (E) ... to the environment which was provided by appellant for the minor children...."

As to the appellant's claim in subpoint A, it is well settled that, "[u]nder Missouri law, a successor judge is without power to render a judgment based on testimony and evidence heard by his predecessor absent a stipulation by the parties." *Cent. Bank of Kansas City v. Costanzo,* 873 S.W.2d 672, 674 (Mo.App.1994) (*citing Helton Constr. Co. v. Thrift,* 865 S.W.2d 419, 422–23 (Mo.App.1993); *Lansing v. Lansing,* 736 S.W.2d 554, 558 (Mo.App. 1987); *Smith v. Smith,* 558 S.W.2d 785, 790 (Mo.App.1977)). In our case, the record reflects that the parties did stipulate, in writing, that the successor circuit judge,

based solely on his reading of the transcript, could decide the case and render judgment accordingly. As such, the appellant cannot now be heard to complain that the successor judge was prohibited from deciding the case and entering his judgment because he had not heard the testimony and evidence. Having decided subpoint A, we now turn to the remaining four subpoints of Point I.

 Section 452.375.2 requires the trial court to "determine custody in accordance with the best interests of the child." In dóing so, the court is to:

consider all relevant factors including:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ,ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

*Id.* As to these factors, § 452.375.6 provides:

If the parties have not agreed to a custodial arrangement, or the court determines such arrangement is not in the best interest of the child, the court shall include a written finding in the judgment or order based on the public policy in subsection 4 of this section and each of the factors listed in subdivisions (1) to (8) of subsection 2 of this section detailing the specific relevant factors that made a particular arrangement in the best interest of the child. If a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment or order detailing the specific relevant factors resulting in the rejection of such arrangement.

If written findings are required of the trial court by § 452.375.6, but are not made, the award of child custody will be reversed and the case remanded for the court to make the necessary findings and an award in accordance therewith. *Brandow v. Brandow*, 18 S.W.3d 584, 587–88 (Mo.App. 2000).

In the case at bar, the record reflects that the parties did not agree upon a custodial arrangement regarding their minor children, and that the trial court rejected their plans in entering its award of custody. As such, the trial court was required to make the findings as set forth in § 452.375.6. The court, however, did not make the required findings. Hence, we must reverse and remand for the trial court to do so. *Brandow*, 18 S.W.3d at 587–88. Accordingly, we do not reach the merits of the issues raised by the appellant in subpoints B–E of Point I.

## II.

 In Point II, the appellant claims that the trial court erred in awarding the

respondent $10,000 of the $32,000 in attorney's fees she incurred because, in doing so, it failed to consider, as required, the respondent's financial resources to pay her attorney's fees; the respondent's conduct during the marriage; and the parties' conduct during the dissolution proceeding. As to the respondent's financial resources, the appellant contends that the trial court failed to consider that she was awarded a judgment against the appellant of $1,730,000, $530,000 of which was payable within 90 days of judgment entry, as well as various items of real and personal property, which enabled her to pay her own attorney's fees. As to the respondent's conduct during the marriage, causing her to incur added attorney's fees, the appellant contends that the respondent's drug usage "necessitated many of the actions taken by Appellant in the preparation and presentation of his case." As to the parties' conduct during the dissolution that may have contributed to the respondent's incurring additional attorney's fees, the appellant contends that he was cooperative throughout and that the time required to present his case was reasonable given the extent of the respondent's misconduct during the marriage, which was a relevant inquiry in determining the issues before the court.

 Section 452.355.1 governs the awards of attorney's fees in dissolution proceedings and provides:

> Unless otherwise indicated, the court from time to time after considering all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action, may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding pursuant to sections 452.300 to 452.415 and for attorney's fees, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding and after entry of a final judgment. The court may order that the amount be paid directly to the attorney, who may enforce the order in the attorney's name.

With respect to such an award, we will not reverse a trial court's decision as to an award of attorney's fees pursuant to § 452.355, unless we find that the court abused its discretion. *Glenn v. Glenn,* 930 S.W.2d 519, 525 (Mo.App.1996). To demonstrate an abuse of discretion, the complaining party must show that the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice. *Id.*

 "The trial court is, of course, an expert on the issue of attorney's fees and may independently determine and award such fees as it deems appropriate." *Taylor v. Taylor,* 25 S.W.3d 634, 649 (Mo. App.2000) (citations omitted). In awarding attorney's fees, the court should consider any relevant factors, including "the spouses' financial resources and conduct during the marriage." *McNair v. McNair,* 987 S.W.2d 4, 8 (Mo.App.1998) (citing *Kovach v. Kovach,* 873 S.W.2d 604, 608 (Mo.App.1993)). However,

> [a] spouse's inability to pay his or her attorney's fees is not a requirement for awarding attorney's fees. One spouse's greater ability to pay is sufficient to support an award of attorney's fees to the other spouse. The trial court has discretion to award attorney's fees to a spouse who was awarded sufficient assets to cover those fees.

*Id.* (citations omitted). In addition to considering the financial resources of the parties and their conduct during the marriage, the court can consider any unreasonable conduct of a spouse during the dissolution proceeding that may have increased the other spouse's attorney's fees. *Gendron v. Gendron,* 996 S.W.2d 668, 672 (Mo.App. 1999) (citing *T.B.G. v. C.A.G.,* 772 S.W.2d 653, 655 (Mo. banc 1989)); *Calhoun v. Calhoun,* 934 S.W.2d 14, 15 (Mo.App.1996) (citing *Kovach,* 873 S.W.2d at 608).

Here, the respondent received approximately 40 percent of the marital property, with her share being valued at $1,730,000, $530,000 of which was payable within 90 days of the judgment. Obviously, this would have enabled her to pay her own attorney's fees. However, as noted, *supra*, a spouse's ability to pay his or her own attorney's fees does not *per se* preclude the spouse from receiving an award of attorney's fees if other relevant factors favor such an award. *McNair*, 987 S.W.2d at 8. According to the trial court, such is the case here. In this regard, the court, in finding that the appellant caused the trial to be unduly protracted, resulting in the respondent's incurring needless and additional attorney's fees, stated that "the trial went on and on and on ... because of witnesses that the [appellant] chose to present," while the "respondent's evidence was brief." The court further stated:

> I have them about 20 percent of their request [for attorney's fees]. And I will tell you, in addressing that issue, that was the reason for it. That I felt like they were there about 20 percent—at least 20 percent longer than they needed to be, with what I considered to be repetitive cumulative testimony put in place by the—by the [appellant]. And I read every word, and it was long.

There is evidence in the record to support the trial court's finding on this issue, an issue that was relevant to the court's determination of an award of attorney's fees. *Gendron*, 996 S.W.2d at 672.

As to the appellant's assertion that the trial court failed to consider the respondent's conduct during the marriage in awarding attorney's fees, specifically her drug use, he points to nothing in the record that would indicate that this is so. As such, we can presume that the trial court considered her conduct during the marriage, but found that it was outweighed by other factors. Moreover, the record reflects that there was evidence from which the trial court could have found that neither party's conduct during the marriage

was above reproach, such that the parties' conduct during the marriage was not a factor when determining its award of attorney's fees.

For the reasons stated, we find that the trial court did not abuse its discretion in awarding $10,000 in attorney's fees to the respondent.

Point II is denied.

### III.

In Point III, the appellant claims that the trial court erred in awarding him his non-marital property, as required by § 452.330, because in doing so it misapplied the law found in that section, and its award was against the weight of the evidence. Specifically, he claims that the parties maintained a safe deposit box containing certain items of his non-marital property that the respondent took without his permission, and that the trial court failed to award him this property and order the respondent to return the property to him or pay him the value for the same. Section 452.330, which governs the division of property in a dissolution proceeding, mandates a two-step process to be followed by the trial court: (1) the court must first set aside to each spouse his or her non-marital property; and (2) then divide the marital property and debts in such proportions as the court deems just. *Nelson v. Nelson*, 25 S.W.3d 511, 516–17 (Mo.App.2000) (citations omitted). It is the first step of this procedure that the appellant challenges on appeal.

As to the non-marital property kept in the safe deposit box, the appellant testified that it included: (1) a large coin collection, consisting of $4,600 in quarters, $1,400 in half dollars, and approximately 300 collectible pennies worth $4,500; (2) a pearl-handled pistol; (3) some jewelry belonging to the parties' daughters; and (4) three knives. He also testified to numerous other items of property that were allegedly in the safe deposit box, but does not claim them as his separate property. However,

the appellant does not challenge the fact that the safe deposit box was listed in both parties' names.

All property acquired by either spouse subsequent to the marriage is presumed to be marital property. § 452.330.2; *Ansley v. Ansley*, 15 S.W.3d 28, 35 (Mo.App.2000). This presumption can be overcome by showing that the property was acquired "by gift, bequest, devise, or descent," thus rendering it non-marital property. § 452.330.2(1). As to how he acquired the property in question, the appellant testified that an unspecified portion of the coin collection was given to him by his father at his father's death; that the pearl-handled pistol was given to him by his grandmother, who is still alive; that his grandmother also gave the jewelry to the parties' daughters; and, as to the knives, that he had purchased one and the other two were given to him. Although he did not testify as to when he allegedly last saw the items in the safe deposit box or the exact date he learned that they were missing, he testified that he believed the respondent had taken them without his permission, and that she either still had the property in her possession or had disposed of it. As such, he contends that he was entitled, as his non-marital property, to either the return of the property from the respondent or to the value thereof.

For her part, the respondent admitted that, after being served with an *ex parte* order of protection excluding her from the marital home, she took approximately $1,200 in quarters and half dollars from the safe deposit box, but denied taking any other items. She testified that she took this money to pay for her necessary living expenses. The respondent further testified that she had taken coins on other occasions during the marriage, but that she used the coins taken on these occasions to pay for family expenses. A witness for the appellant, Teresa Todd, testified that she had been with the respondent one time when she had removed items from the safe deposit box, but that the only items she saw taken were some coins.

Although the appellant testified that the parties' safe deposit box was 24 inches long, 12 inches wide, and 10 inches high, Janice Shelton, vice president of the bank in which the safe deposit box was located, testified on the respondent's behalf that the largest box the bank offered was 10 inches by 10 inches. She further testified that she attempted to put the coin collection claimed by the appellant to be in the parties' safe deposit box into one of these boxes, but it would not fit and what did fit weighed over 460 pounds. She also testified from the bank's records that the appellant had entered the box four times between October 1995 and October 1997, while the respondent had entered it sixteen times between May 22, 1997, and August 16, 1997.

A review of the judgment reflects that the trial court not only did not award the property in question to the appellant, but did not make any findings with respect thereto. The court did state on the record, at the August 24, 1999, hearing on the appellant's motion to amend the judgment: "I'm telling you I didn't think the evidence supported the position that your client took that there was $80,000 worth of property in there. In other words, I didn't find that credible enough to deal with, that she would have taken it and done anything with it." From this, we can glean that the trial court did not believe the appellant's evidence that there was separate property to the extent claimed by the appellant, or that even if it did exist, the evidence did not support a finding that the respondent had taken all the items claimed. In other words, the issue ultimately turned on a question of credibility, on which we defer to the trial court. *Crews v. Crews*, 949 S.W.2d 659, 665 (Mo.App.1997).

Except for the $1,200 admittedly taken by the respondent to pay for her expenses immediately upon separation, the record would reflect that the evidence

was such that the trial court could have reasonably found that the property in question did not exist to the extent claimed.[2] For instance, the appellant produced no evidence of his father's intent that he hold the coin collection for himself and his sisters. His father did not leave a will, and neither the appellant's mother nor his sisters, who are still living, testified at trial as to the veracity of this intestate distribution or that the appellant ever received possession of this property. The failure of a party to call a witness having knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to proffer it. *Lisec v. Coy,* 793 S.W.2d 173, 177 (Mo.App.1990) (*citing Leehy v. Supreme Express & Transfer Co.,* 646 S.W.2d 786, 790 (Mo. banc 1983)). Thus, by not calling these available witnesses to testify, the presumption arises that they would not have corroborated the testimony given by the appellant. This same presumption arises with respect to the pearl-handled pistol and jewelry given to the appellant by his grandmother, who is also still living.[3] By not calling his grandmother to testify as to her bestowing these gifts upon himself and his daughters, the presumption arises that no such gifts were made. In addition, the record reflects the fact that, per Ms. Shelton's testimony, it was impossible for all of the claimed items to fit in the bank's largest safe deposit box. Finally, other than the respondent's admission that she took $1,200 in coins from the safe deposit box, there was simply no evidence in the record

to suggest that, even if the property was in the box, the respondent took it.

For the reasons stated, we cannot say that the trial court misapplied the law in distributing the non-marital property of the parties or that it was against the weight of the evidence.

Point III is denied.

## IV.

 In Point IV, the appellant claims that the trial court erred in awarding him his marital property, as required by § 452.330, because in doing so it misapplied the law of that section and its award was against the weight of the evidence. The record reflects that the trial court awarded the appellant approximately 60% of the marital estate, valued at over $5 million. Specifically, he claims that the court, in awarding marital property, should have credited him for $200,000 in non-marital contributions to the marital estate, but did not. In this regard, he testified that after the marriage, he sold three duplexes located in Grandview, Missouri, and 20 acres of land in Pleasant Hill, Missouri, which he owned prior to the marriage, and used the $200,000 in sale proceeds realized to purchase certain other properties, which the trial court correctly found to be and distributed as marital property.

 The trial court has considerable discretion in dividing marital property. *In re Marriage of Petersen,* 22 S.W.3d 760, 763 (Mo.App.2000) (*citing Dardick v. Dardick,* 670 S.W.2d 865, 869 (Mo. banc 1984)). The trial court's division of property is

2. As to the $1,200 in coins taken by the respondent from the coin collection, by not ordering the respondent to account to the appellant for those coins, we can infer that the court considered this money to be a necessary expenditure on the part of the respondent for her living expenses following the parties' separation, especially in light of the fact that the appellant blocked the respondent from any access to the parties' joint accounts and no award of temporary maintenance was entered until October 1995, leaving her without funds for two months. *See Cofer v. Price–Cofer,* 825 S.W.2d 369, 373 (Mo.App.1992) (holding that

necessary expenses, such as living expenses, are not considered a squandering or secreting of marital property such that reimbursement or a set-off should be ordered).

3. As the jewelry, by the appellant's own admission, belonged to the parties' daughters, the court did not err in making no findings regarding it, as the court has no jurisdiction over the property of third parties in a dissolution proceeding. *Randolph v. Randolph,* 8 S.W.3d 160, 168 (Mo.App.1999).

presumed correct, and the appellant bears the burden of overcoming this presumption. *Id.* (citation omitted). The division of marital property will only be disturbed if the distribution of marital property is so "heavily and unduly weighted in favor of one party as to amount to an abuse of discretion." *Crews,* 949 S.W.2d at 663 (*quoting Dodson v. Dodson,* 904 S.W.2d 3, 6 (Mo.App.1995) (citation omitted)). "Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Waisblum v. Waisblum,* 968 S.W.2d 753, 755 (Mo. App.1998) (*citing In re Marriage of Jennings,* 910 S.W.2d 760, 765 (Mo.App.1995)).

■ The appellant is correct in his assertion that the trial court, in dividing marital property, is to consider the contribution of each spouse in acquiring the marital property. § 452.330.1(2); *Petersen,* 22 S.W.3d at 763; *Robertson v. Robertson,* 3 S.W.3d 383, 385 (Mo.App.1999). " 'Section 452.330.1 gives the trial court great flexibility and far-reaching power to divide the marital property so as to accommodate the needs of the parties upon dissolution and there is no formula respecting the weight to be given the relevant factors which a court may consider.' " *Waisblum,* 968 S.W.2d at 756 (*quoting Crews,* 949 S.W.2d at 664 (citation omitted)). "The court is only required to make a fair and equitable division of property." *Id.* (citation omitted).

The respondent concedes that the duplexes and the 20 acres were purchased by the appellant and titled solely in his name prior to the marriage of the parties. However, she contended at trial that this property was purchased using funds from a joint savings account to which she had contributed prior to the marriage. In this regard, she testified that, prior to the marriage, she had worked at various jobs and began depositing her paychecks in a joint account which the parties opened in 1977.

Hence, she contends that the duplexes and the 20 acres were not the appellant's non-marital property, as he contends, such that the trial court correctly did not view the sale proceeds therefrom as solely a non-marital contribution by the appellant to the acquisition of the marital property in question.

There is nothing in the record to support the appellant's position that the trial court gave him no credit for his non-marital contribution to the purchase of the parties' marital property, as he seems to assert. In fact, the record would reflect that the trial court recognized a contribution by the appellant and considered it, but did not find it to be significant given the totality of the circumstances. In this regard, in its judgment entry, the court specifically found "that there [was] not sufficient credible evidence to support [the appellant's] claim of $200,000.00 non-marital interest in any real estate holdings." In addition, the court stated on the record at the August 24, 1999, hearing on the appellant's motion to amend that:

> there had been such a commingling of these—that there was not—there was not—with regard to these pieces of real estate, there was not any basis for the Court to try to separate out those funds from that long ago and try to determine what percentage of their net worth was derived from his non-marital contribution. In other words, what I felt like was by this time, based on what was done with the money, and nature and extent of the estate of the parties, that it was not a significant contribution on his part that would warrant a separation of non-marital award to him.

From this, we glean that the trial court believed the respondent's testimony, which it was free to do, that she contributed, in part, to the purchase of the duplexes and the 20 acres which were sold and used to purchase the marital property of the parties. Given this fact and the fact that the appellant received 60% of the estate, we cannot say that the trial court, based on

the record before it, did not give proper consideration to the appellant's non-marital contributions to the marital estate and abused its discretion in dividing the parties' marital property, as he contends.

Point IV is denied.

## Conclusion

The judgment of the trial court dissolving the marriage of the parties is affirmed except with respect to its award of child custody, which is reversed and the case remanded for the sole purpose of making written findings, in compliance with § 452.375.6, and entering its award of child custody in accordance therewith.

SPINDEN, C.J., and NEWTON, J., concur.