**In re the Marriage of: Brent Scott HALFORD, Petitioner– Respondent,**

v.

**Beverly Kay HALFORD, Respondent– Appellant.**

**No. SD 29354.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 31, 2009.

James R. Sharp, Springfield, MO, Attorney for Appellant.

Roy E. Williams Jr., West Plains, MO, Attorney for Respondent.

DON E. BURRELL, Presiding Judge.

Beverly Halford ("Mother") appeals from the judgment that dissolved her marriage to Brent Halford ("Father"). Mother asserts two points of trial court error: 1) that the physical custody award was not supported by substantial evidence; and 2) that the legal custody award is not compatible with the statutory definition of "joint legal custody" and the court's parenting plan lacks certain provisions mandated by statute. Finding an ambiguity in the trial court's physical custody award and Mother's second point to have merit, we affirm in part, reverse in part, and remand with directions.

Mother and Father had been married for twenty years when Father filed his dissolution petition. The parties have two minor children, B.D.H., a daughter, and B.S.H, a son. In their respective attempts to gain custody of the children, Father alleged that Mother had participated in extra-marital affairs and engaged in various incidents of fraudulent behavior, while Mother accused Father of having a violent temper and of choking her in front of B.S.H. The trial court dissolved the marriage on February 26, 2008. The portion of the trial court's dissolution decree ordering relief purported to grant the parties joint legal custody of their children with Father to receive "actual physical custody" and Mother to receive "visitation."[1]

We will affirm the trial court's judgment "unless it is not supported by

---

1. The terms the trial court used in various portions of its decree and parenting plan to refer to time periods the children would be spending with Mother were inconsistent. That contact was variously referred to as: "custodial rights and privileges;" "visitation;" "physical custody;" "actual custody;" "custo-

substantial evidence, is against the weight of the evidence, or misapplies or erroneously declares the law." *In re Marriage of Wood,* 262 S.W.3d 267, 270 (Mo.App. S.D.2008). "Substantial evidence" simply means "competent evidence from which the trial court could reasonably decide the case." *Bauer v. Bauer,* 38 S.W.3d 449, 455 (Mo.App. W.D.2001). "[W]e defer to the trial court's credibility determinations" and it is free to believe or disbelieve all, part, or none of the testimony of any witness. *In re Marriage of Dolence,* 231 S.W.3d 331, 333–34 (Mo.App. S.D.2007). We view the evidence and all inferences therefrom in the light most favorable to the judgment and ignore all contrary evidence and inferences. *Id.* at 334. "The trial court has broad discretion in [custody] matters and we presume that the court awarded custody in accordance with the child[ren]'s best interest." *L.J.S. v. F.R.S.,* 247 S.W.3d 921, 925 (Mo.App. S.D.2008). We will, therefore, uphold the trial court's decision "unless we are firmly convinced that the welfare and best interests of the child[ren] require otherwise." *Id*

Section 452.375.2 requires a trial court to base its custody award on the best interests of the children and sets forth eight non-exclusive factors the court must consider in making that determination.[2] Mother asserts that five separate findings made by the trial court in addressing these factors were not supported by substantial evidence.

First, although Mother admitted to having engaged in various extra-marital affairs, she alleges that no evidence was presented that indicated these relationships had any sort of negative impact upon the children and that the trial court's decision to award Father their "actual physical custody" improperly "punished" Mother for these past relationships.

Mother testified that she was involved in a ten-year extra-marital affair with Dr. Shoults ("Shoults") from 1994 to 2003. Shoults testified that he was "under the impression" that B.S.H. was his son and he had been voluntarily paying Mother monetary support for B.S.H. for three years.[3]

---

dial/visitation rights;" "custody;" and "custodial period."

**2.** These factors are:
(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
(5) The child's adjustment to the child's home, school, and community;
(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the

court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and any other child or children for whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;
(7) The intention of either parent to relocate the principal residence of the child; and
(8) The wishes of a child as to the child's custodian.
Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2009.

**3.** A subsequent DNA test concluded that Shoults was not the biological father of B.S.H.

Mother also admitted that she had an affair with Brandon Schlitz ("Schlitz"), that their relationship began after Father filed for divorce but before the parties' marriage was dissolved, and that she, the children, Schlitz, and Schlitz's daughter all lived together in the same house for at least two weeks.

The trial court's findings on these matters were that:

> [Mother] has knowingly, intentionally and willfully placed the minor children in the presence of one or more male paramours and has specifically misrepresented facts or circumstances regarding the relationship of at least one paramour to the minor children, specifically Dr. Nicholas Shoults, with whom [Mother] carried on an open, continuous and ongoing relationship, representing to both Mr. Shoults and the minor children that Mr. Shoults was the natural, biological father of [B.S.H.]. Further, [Mother] has engaged in a continuous, ongoing and open relationship with a male paramour, in the presence of the minor children during the pendency of these proceedings.

■ While Mother is correct that no direct evidence was presented that showed the children had been negatively affected by Mother's extra-marital affairs, none was required. As this court has previously stated, "[a] trial court may properly consider moral fitness in determining child custody issues," and a party's "conduct of affairs with the knowledge of children and while they are present in the house has been held to be a critical factor in denying [that party] custody." *Jones v. Jones*, 937 S.W.2d 352, 356 (Mo.App. S.D.1996).

■ Second, Mother alleges there was no evidence indicating that she had intentionally interfered with Father's relationship with the children. The record does not support that claim. From December until the end of January, Mother and Father arranged to meet at the local police station to exchange custody of the children. Father was supposed to pick the children up at 3:30 p.m. Father testified that on approximately six or seven occasions, Mother was late for these exchanges and did not show up until around 5:00 p.m. Two other witnesses also testified that Mother had interfered with Father's relationship with the children. Bridget Williams ("Williams"), the Superintendent of Mountain Grove School, testified that she had observed a situation after a volleyball game in which B.S.H. appeared to want to have a conversation with his Father. Williams was then asked, "Based on your observations did [Mother] interfere with that?" Williams responded, "[B.S.H] never went to see his dad." Jake Blayton, whose daughter participates in sports and extracurricular activities with B.D.H., testified that he witnessed conduct by Mother that he believed kept Father from having contact with the children. Specifically, Blayton testified that he saw Mother call the children to her and leave the ballgame before they could talk to Father.

During the time the dissolution case was pending, Mother had also filed two separate petitions against Father that sought the issuance of an adult order of protection. The first petition was apparently dismissed by the agreement of the parties. The second was dismissed by the court after an evidentiary hearing.

In regard to these matters, the court's findings were:

> The Court finds that during the pendency of these proceedings, [Mother] has filed at least two separate Petitions for Adult Protection, one of which was voluntarily dismissed, and the other one of which was dismissed by the court after an evidentiary hearing. In both

proceedings, [Mother] requested custody of the minor children and, during the pendency of those proceedings, interfered with [Father]'s custodial rights and privileges. Further, and despite having no legitimate purpose or basis therefore, [Mother] interfered with [Father]'s ability to have contact with the minor children during the pendency of this proceeding, by frustrating the exchange of the parties' minor children, when other appropriate alternatives existed.

█ Third, Mother points out that there was considerable evidence that the children had seen Father display an uncontrolled temper that had once resulted in his physically assaulting her in their presence. Father admitted that on one occasion he had "grabbed [Mother] by the neck." This incident occurred after he had confronted Mother about her making sixty-two phone calls in a single month to James Ryan Allen ("Allen"), the coach of B.S.H.'s traveling baseball team. Father testified that he let go of Mother when he noticed that his son was watching. Father also admitted that he smashed a computer in the driveway after he caught Mother communicating with Schlitz via the internet. Father also testified that he struck a light pole at a baseball game with his hand because Mother was talking to Schlitz on the phone and punched a hole in the wall when he found out that she had been having an affair with yet another man.

The other incidents Mother refers to were not admitted by Father and the court was not required to believe that they had occurred. There was also testimony from an unlikely source that Father's temper was not out of the ordinary. When Allen was asked whether he thought Father had a hot temper, he testified, "No, not any more than me or anybody else."

The trial court's findings in regard to Father's temper were as follows:

The Court finds that there was evidence in this case of [Father]'s temper and physical conduct and behavior by [Father] toward [Mother], occurring on at least one occasion in the presence of the parties [sic] minor children. However, the court finds that [sic] incidents were isolated in nature, not directed toward the minor children and occurred in the wake of emotionally charged circumstances between [Father] and [Mother].

While we do not condone Father's admitted behavior, when viewed in the light most favorable to the judgment, the evidence supported the trial court's finding that these incidents were isolated in nature and had all occurred after Father had discovered or suspected that Mother was involved in a relationship with another man. The trial court could also have inferred that Father's fits of jealous anger would be less likely to occur once he had determined that the marriage could not be preserved.

█ Fourth, Mother alleges the trial court abused its discretion in awarding Father custody because B.D.H. (a fifteen-year-old at the time of trial) strongly expressed a desire to live primarily with Mother because she was in fear of Father's anger. B.D.H. also testified, however, that Father was more restrictive than Mother about letting her see her boyfriend. The trial court found that B.D.H.'s expressed preference was "primarily due to [Mother]'s liberal parental rules and discipline as opposed to those of [Father]." The court could have inferred that B.D.H. desired to live primarily with Mother because Mother would let her see her boyfriend more often. More importantly, "[t]he preference of a child as to custody should be followed only if the welfare and interest of the child, as determined by all

the evidence, are consistent with that preference." *In re Marriage of Newberry,* 745 S.W.2d 796, 798 (Mo.App. S.D.1988). Viewed in the light most favorable to the judgment, the court's belief as to B.D.H.'s true motivation provided further support for its conclusion that living primarily with Mother was not in the child's best interests.

▪ Fifth, Mother alleges there was no evidence in the record regarding the Guardian ad Litem's ("GAL") custody recommendation despite a reference to such a recommendation in the judgment. The trial court stated in its judgment that it had "reviewed and considered the recommendations of the Guardian ad Litem, presented to the court by letter dated March 28, 2008." The trial court's docket sheet, however, does not indicate that any such letter was ever filed with the court. As a result, Mother complains "there is no indication in the transcript or the legal file as to what those recommendations were, besides [sic] that both parties should get counseling."

In support of her contention that this discrepancy requires a reversal of the judgment, Mother cites *McCubbin v. Taylor,* 5 S.W.3d 202 (Mo.App. W.D.1999), which held that the trial court had committed reversible error by failing to consider a child counselor's report. *McCubbin* involved a motion to modify custody. *Id.* at 205. The original custody order granted Mother "primary physical custody" and Father was granted "visitation." *Id.* Father filed his motion to modify custody after Mother notified him of her intent to relocate. *Id.* The trial court granted Father's motion and placed the child "in the permanent physical custody of Father." *Id.* On appeal, the western district of our court held that the record before the trial

court did not support a finding that "the custody transfer would be in the best interest of the child." *Id.* at 206. In reaching this result, it stated that "[t]he record does not reflect that the [trial] court ever considered the child counselor's report which recommended leaving the child with her mother, the child's interaction with her sibling, or her adjustment to home, school and community, or the child's wishes." *Id.*

▪ In *McCubbin,* the child counselor's report was one of at least four specific pieces of evidence the trial court failed to consider. In the instant case, there is no claim that the trial court failed to consider certain evidence. And, while this court has stated that it is "imperative" for the GAL to conduct an independent investigation and present to the trial court his or her opinion as to what would serve the child(ren)'s best interests, this can be done "through active participation in the proceedings without the necessity of a formal, explicit recommendation." *State ex rel. State of Kansas Social and Rehabilitation Services v. R.L.P.,* 157 S.W.3d 268, 278 (Mo.App. S.D.2005). The record does not reveal what recommendations were set forth in the GAL's letter (if such a letter was sent by the GAL), and Mother does not state how she was prejudiced by this discrepancy she contends constituted reversible error.[4]

What the record does reveal is that the GAL questioned witnesses at trial and made an oral statement to the court at the close of the evidence which did not include any recommendation as to custody but did recommend that each party seek counseling. Mother did not call the GAL as a witness or ask that he make a custody recommendation to the court. Mother has not even alleged—let alone pointed to any

4. We should not reverse the trial court unless both error and prejudice are demonstrated. *See In Re Marriage of Garrett,* 654 S.W.2d 313, 316–17 (Mo.App. S.D.1983).

evidence that would support such a claim—that the GAL's recommendation (which the court was not required to follow) would have been favorable to Mother.

All of the findings challenged by Mother were supported by substantial evidence and she has failed to overcome the presumption that the trial court's decision was in the best interests of the children. That being said, one issue hinted at (but not specifically challenged) by Mother involving the trial court's use of the term "actual physical custody" must, nevertheless, be addressed.

In the findings portion of its decree, the trial court stated that the best interests of the children required Father to have "Sole Physical care, custody and control of the minor children, subject to [Mother] having visitation rights and privileges in the minor children, the specifics of which are set forth herein below. . . ." In the subsequent portion of its decree ordering relief, however, the trial court ordered that Father "shall have 'actual physical custody' of the minor children at all times not otherwise set forth herein to [Mother]." The trial court's failure to order physical custody in one of the two forms approved by statute (sole or joint) and in a manner consistent with its factual findings requires us to remand the case with a direction that the trial court enter a judgment that consistently grants Father sole physical custody and refers to Mother's child contact periods as visitation. *See Loumiet v. Loumiet,* 103 S.W.3d 332, 337

(Mo.App. W.D.2003) (stating that joint physical custody gives rise to a "joint physical custody schedule" while a "visitation schedule" is used only in a sole custody situation). Resolving the ambiguity is important (and not merely a matter of semantics) because determining which statutory provisions govern any future modification of parenting time depends on whether what is being modified is classified as custody or visitation. *See Bather v. Bather,* 170 S.W.3d 487, 497 (Mo.App. W.D.2005).

To the extent that her first point challenges the evidentiary basis for the trial court's decision to award Father sole physical custody of the children, it is denied.

Mother's second point alleges the trial court's decree is inconsistent with the statutory definition of joint legal custody and that its incorporated parenting plan does not comply with the requirements of sections 452.375.9 and 452.310.7. Mother's specific complaint is that the parenting plan is inconsistent with an award of joint legal custody because it does not proscribe a mechanism for determining which extracurricular activities the children will participate in, how medical conditions of the children are to be communicated, or set up a dispute resolution procedure to handle matters about which the parties cannot agree. Mother properly preserved her claim of error by filing a motion to amend the judgment that included these complaints.[5]

---

5. Father's brief argues that Mother should be estopped from making this allegation of error because she acquiesced in the judgment by failing to affirmatively respond with any complaints about a proposed amended judgment that Father had tendered to the trial court for its consideration after it had entered its judgment. In making this argument, Father cites to several documents that are included in the appendix to his brief but are not contained in the legal file. "The mere inclusion of documents in an appendix to a brief does not make [them] part of the record on appeal." *State ex rel. Miss. Lime Co., v. Missouri Air Conservation Com'n,* 159 S.W.3d 376, 380 n. 2, 386 n. 10 (Mo.App. W.D.2004). Father also fails to cite any authority in support of his claim that failing to comment on a proposed amended judgment drafted by the other party and presented to the trial court post-judgment

As previously mentioned, the trial court purportedly ordered that Mother and Father receive joint legal custody of the children. Section 452.375.1(2) states " '[j]oint legal custody' means that the parents share the decision-making rights, responsibilities, and authority relating to the health, education and welfare of the child, and, unless allocated, apportioned, or decreed, the parents shall confer with one another in the exercise of decision-making rights, responsibilities, and authority." Though its decree ordered "joint legal custody," the trial court's factual findings were that:

> The [trial court] further finds that the parties lack a commonality of interests and beliefs regarding matters pertaining to the health, education, and welfare of the minor children and that requiring the parties to communicate, cooperate and reach mutual decisions regarding those issues pertaining to the minor children would endanger their emotional, psychological and physical health and well being. It is in the best interest and welfare of the minor children for [Father] to decide all matters of education, health, and medical care for the minor children.

■■■■ "A commonality of beliefs concerning parental decisions and the parties' ability to function as a parental unit in making those decisions are important considerations in determining whether joint legal custody is in the child's best interests." *In re Marriage of M.A.*, 149 S.W.3d 562, 569 (Mo.App. E.D.2004). Thus, "[i]f the parties are unable to communicate or cooperate and cannot make shared decisions concerning their children's welfare, joint legal custody is inappropriate." *Id.* An award of joint legal custody is inconsis-

tent with a finding that it would endanger the children's emotional, psychological and physical health and well being to require the parties to communicate with each other and reach mutual decisions. Because the trial court's award of joint legal custody is inconsistent with its factual findings and the definition of joint legal custody, we are remanding the case and directing the trial court to enter a judgment that unambiguously awards Father sole legal custody of the children.

■■■■ Whether joint or sole custody is awarded, section 452.375.9 requires that "[a]ny judgment providing for custody shall include a specific written parenting plan setting forth the terms of such parenting plan arrangements specified in subsection 7 of section 452.310." The relevant portions of subsection 7 of section 452.310 require the trial court's parenting plan to be:

> A specific written plan regarding legal custody which details how the decision-making rights and responsibilities will be shared between the parties including the following:
>
> . . . .
>
> (b) Medical, dental and health care decisions including how health care providers will be selected and a method of communicating medical conditions of the child and how emergency care will be handled;
>
> (c) Extracurricular activities, including a method for determining which activities the child will participate in when those activities involve time during which each party is the custodian;
>
> . . . .
>
> (f) A dispute resolution procedure for those matters on which the parties dis-

---

(without formally moving that the court enter it) waives the right to challenge the judgment actually entered. The record does not reveal

why the trial court did not respond to Mother's motion to amend the judgment to include provisions required by statute.

agree or in interpreting the parenting plan; ...

The parenting plan ordered by the trial court awards Father the right to make decisions regarding the children's health and medical care and states that Mother shall receive notice and have access to information related to the children's health and medical care. It does not, however, set forth how emergency care will be handled. This omitted provision is particularly important because an emergency may occur while the children are with Mother— a parent with no authority to make any medical care decisions on behalf of the children. The trial court's parenting plan also fails to contain statutorily required provisions governing extracurricular activities and a process for resolving disputes.[6] Mother's second point is granted.

For the reasons set forth herein, the judgment of the trial court granting father "actual physical custody" and the parties' joint legal custody of the children is reversed. The trial court is directed to enter a judgment that grants sole legal and physical custody of the children to Father and incorporates a parenting plan that: 1) unambiguously designates Mother's time with her children as "visitation;" 2) complies with all of the requirements of section 452.310.7 as incorporated by section 452.375.9; and 3) is otherwise in the best interests of the children. In all other respects, the judgment is affirmed.

LYNCH, C.J., and PARRISH, J., Concur.

6. It is certainly arguable, as suggested by Father, that if a parent is awarded sole decision making authority over the children, no dispute resolution process is necessary in regard to most matters on which the parties might disagree. This would not negate, however, the need for such a process to handle disputes about the interpretation of the parenting plan.