**William CHAPIN, Appellant,**

v.

**Stacie CHAPIN, Respondent.**

**No. WD 55372.**

Missouri Court of Appeals,
Western District.

Jan. 12, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 2, 1999.

---

William E. Shull, Liberty, for appellant.

Thomas E. Hankins, P.C., Liberty, Thomas E. Hankins, for respondent.

Before Presiding Judge ALBERT A. RIEDERER, Judge HAROLD L. LOWENSTEIN, and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Appellant, William Chapin (Father), appeals the portion of the trial court's dissolution decree awarding custody of the parties' minor child, Rachel, to Respondent, Stacie Chapin (Mother). Father argues that the trial court erred: (1) in failing to appoint a guardian ad litem for the child during the course of the trial once evidence of abuse was presented to the court, and (2) in awarding primary physical custody to Mother when, he asserts, the weight of the evidence showed that it was in the best interests of the child that he be given primary custody. Because we find the relevant statutes did not require the court to appoint a guardian ad litem and

that it did not abuse its discretion in failing to do so, and because the record supports the court's determination of custody, we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Father and Mother were married on August 5, 1989. They had one child, Rachel, who was born on July 26, 1993. Mother began experiencing dissatisfaction with the marriage in 1993 and admitted to an extramarital affair during that same year, and over the succeeding years expressed uncertainty as to her ability to continue in her role as a wife and mother. Finally, on January 10, 1997, Father filed a Petition for dissolution of marriage in which he sought primary physical custody of Rachel. While the dissolution proceeding was pending, the parties continued to reside with one another and with their minor child, Rachel, and attended two marital counseling sessions with Dr. Paul Smock. At one of the sessions, Mother told Dr. Smock that she did not want custody of Rachel. Later in January 1997, however, in her Answer and Cross-claim, Mother asked the court to award her primary physical custody of Rachel.

The Commissioner held a hearing on April 1, 1997, at which both parties testified. The evidence showed that both Father and Mother were actively involved in the day-to-day care of Rachel, with each assuming different roles in that care. Father was the parent who took Rachel to day care each day and the one who played with Rachel and worked on teaching her new things, like how to count, work with the alphabet, and draw numbers and letters.

Mother was the parent who took Rachel to her doctor's appointments and haircuts, and participated in the "Parents as Teachers" program. Mother testified she was the one who regularly dressed, fed, and bathed Rachel and got her ready for bed. In addition, if something were to happen while Rachel was at day care, Mother was generally the one who was notified and who would make arrangements to pick Rachel up, if needed. Mother stated that she enjoyed doing things with Rachel such as painting, playing with Barbies, reading books and dancing.

Both parents had jobs and activities which caused them to be away from home for certain periods of time. Father often traveled with his job and was required to be away from home for approximately one night each month. Similarly, Mother was actively involved in community theater productions, which often required her to be away from home several nights during the week.

Mother further testified that she feared Father's negative feelings toward her would affect her relationship with Rachel. Mother stated Father called her names in front of Rachel and told her Mother did not love her. Mother also testified that Father had told her it is a man's prerogative to hit his wife if he wants to, although she admitted he never hit her and that she had actually struck him on one occasion in front of Rachel. She also argued that Father was attempting to exclude her from Rachel's life and that he was hiding things from her, such as legal documents, photo albums and her college diploma. Father suggested, however, that he was just taking precautionary measures by storing some items at his parent's house because he noticed things were disappearing from the home.

On the other hand, Father testified that Mother had been physically rough and emotionally abusive towards Rachel on several occasions. He testified that Mother had a poor temper and often lost control of her emotions in the presence of Rachel. Father also presented several witnesses who testified that Mother stated she did not want Rachel, and who expressed their opinions that Father would be the better primary custodian of Rachel. Mother, however, explained that the alleged incidents were accidents taken out of context, and that she loved Rachel and would never intentionally harm her, and that Father was trying to drive a wedge between her and Rachel and was misrepresenting matters in an effort to become primary custodian. Mother also presented the testimony of several witnesses who testified on her behalf that she was a fine mother.

On July 24, 1997, the trial court issued a Judgment of Dissolution which awarded both parties joint legal custody of Rachel and

awarded Mother primary physical custody of Rachel. Husband was granted reasonable visitation rights and was ordered to pay child support of $517.00 per month for Rachel and to maintain her on his medical insurance policy. Father now appeals the order asserting (1) the trial court erred in failing *sua sponte*, to appoint a guardian ad litem as mandated by Section 452.423.1, and (2) the trial court abused its discretion by awarding custody of the minor child to Mother.

## II. STANDARD OF REVIEW

On appeal of a judgment in a dissolution of marriage proceeding, we review the evidence in the light most favorable to the trial court's decision. *Replogle v. Replogle*, 903 S.W.2d 551, 553 (Mo.App.1995). We will affirm an award of child custody unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Flathers v. Flathers*, 948 S.W.2d 463, 465 (Mo.App.1997), *citing, Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court has broad discretion in child custody matters; as such, we will affirm its decision unless we are firmly convinced that the welfare and best interests of the child requires otherwise. *Flathers*, 948 S.W.2d at 465. Greater deference is given to the trial court in child custody cases than in other types of civil cases. *Id.*

## III. GUARDIAN AD LITEM

Father argues the trial court erred in failing to appoint a guardian ad litem *sua sponte*. He admits that he did not allege child abuse or neglect in his Petition, and that he at no time requested the trial court to appoint a guardian ad litem. He says, however, that Section 452.423(1) RSMo Supp. 1997, required the court to appoint a guardian ad litem once he testified that Mother exhibited a pattern of emotional and physical abuse towards Rachel.

We disagree. Section 452.423(1) provides in relevant part:

> In all proceedings for child custody ... where custody, visitation, or support of a child is a contested issue, the court *may* appoint a guardian ad litem. The court *shall* appoint a guardian ad litem in any proceeding in which child abuse or neglect is alleged.

§ 453.423 (emphasis added).

In *Rombach v. Rombach*, 867 S.W.2d 500 (Mo. banc 1993), our Supreme Court rejected a similar argument that this provision required a trial court to appoint a guardian ad litem whenever evidence of abuse or neglect was presented. In so doing, it noted that the statute does not state that a court shall appoint a guardian ad litem whenever *evidence* of abuse or neglect is presented, but rather that it shall do so when such abuse or neglect is *alleged*. The court then noted that, in the context of a lawsuit, "alleged" is "understood to mean the assertion of claims or defenses in the pleadings. Evidence, on the other hand, refers to items of proof of facts that have been averred or alleged." *Id.* at 502–03.

The court further noted that this limitation of the requirement of appointment of a guardian to situations where abuse allegations are contained in the Petition or Answer is logical, for a guardian should be appointed early in a lawsuit, so that the guardian has time to investigate without unduly delaying the trial, as would occur if the guardian were required to be appointed in the middle of trial if a party alleged abuse or neglect for the first time. And, as the court noted, "[m]oreover, if mere evidence were the test, the trial court would be left with no discretion to ferret out cases where some evidence might arguably exist going to the issues of abuse or neglect, but the evidence is too ambiguous, vague, speculative or remote to justify such an action." *Id.* The court concluded:

> Accordingly, we hold that the mandatory appointment of a guardian ad litem pursuant to § 452.423.1 is triggered only by an allegation of child abuse expressly stated in a pleading and not by the mere introduction of evidence at trial.

*Rombach*, 867 S.W.2d at 503.

This holding is directly applicable here. Neither Father or Mother alleged abuse or neglect in their Petition or Answer. The first time the issue of abuse or neglect was

raised was during some of the testimony offered at trial. Therefore, the trial court was not required by the statute to appoint a guardian ad litem.

Moreover, we do not find that the trial court abused its discretion by failing to exercise its discretionary authority under the statute to appoint a guardian even in the absence of an allegation of abuse or neglect in the pleadings, based on the evidence of abuse and neglect presented.[1] The evidence Father cites of Mother's abusive behavior includes testimony by him or his witnesses that: (1) Mother grabbed and yanked Rachel out of a chair on Christmas Day; (2) Mother pushed Rachel so that she fell to the floor; (3) Mother slapped Rachel on the face, leaving an observable impression of fingerprints on her cheek; (4) Mother threw a Barbie doll near Rachel, which struck her in the face; and (5) Mother knocked Rachel off of a kitchen counter. Father also testified that Mother easily loses her temper and frequently yells and screams at Rachel as well as subjecting her to obscene language.

Mother presented contrary evidence that she did not pull Rachel unduly harshly, that she did not push Rachel off the counter or onto the floor, that Mother simply accidentally hit Rachel with the Barbie doll when she was throwing it into her daughter's room, and that she could recall only a single occasion on which she had mildly slapped Rachel after Rachel had slapped her, and that she did so as part of an effort to show Rachel that slapping was wrong. She also said that she rarely swore or yelled.

Certainly, the trial court was not required to accept Mother's explanations of her conduct. It was free to do so, however, and to reject Father's allegations or to find them "too ambiguous, vague, speculative or remote to justify" appointment of a guardian. *Rombach,* 867 S.W.2d at 503. Indeed, here, even counsel for Father did not request the appointment of a guardian once this evidence was presented. While the trial court can appoint a guardian *sua sponte, see, e.g., Leonard v. Leonard,* 783 S.W.2d 514, 516 (Mo.App.1990), we do not find that he abused his discretion in failing to do so here.

## IV. AWARD OF CUSTODY OF RACHEL TO MOTHER

■ Father also asserts that the trial court erred in awarding primary physical custody of Rachel to Mother because the weight of the evidence showed that it was in Rachel's best interest that he be given primary custody. Father alleges that Mother's emotional and physical abuse of Rachel, physical abuse of Father, violent temper and moral character prevent her from being the best person to choose as Rachel's primary physical custodian.

Section 452.375.2 RSMo Supp.1997, lists eight factors for the trial court to consider in determining custody in accordance with the best interests of the children. These factors include:

(1) The wishes of the child's parents as to his custody;

(2) The wishes of a child as to his custodian;

(3) The interaction and interrelationship of the child with his parents, his siblings, and any other person who may significantly affect the child's best interests;

(4) The child's adjustment to his home, school, and community;

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, the court shall enter written findings of

---

1. Although "abuse" and "neglect" are not defined in chapter 452, we are guided by the definitions of those terms in chapter 210, the chapter governing child protection and reformation. "Child abuse" is defined as "any physical injury, sexual abuse, or emotional abuse inflicted on a child other than by accidental means by those responsible for the child's care, custody, and control, except that discipline including spanking, administered in a reasonable manner, shall not be construed to be abuse." § 210.110(1) RSMo 1994. "Neglect" is defined as "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." § 210.110(8) RSMo 1994.

fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(6) The needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(7) The intention of either parent to relocate his residence outside the state; and

(8) Which parent is more likely to allow the child frequent meaningful contact with the other parent.

§ 452.375.2 RSMo Supp.1997.

The trial court is in the unique position to determine the credibility, sincerity, character, and other intangibles of the witnesses. Where, as here, the trial court did not set out the factors from which it made its determination of child custody, we are "entitled to presume that the trial court considered all the evidence and made its award in the best interests of the child." *Flathers v. Flathers*, 948 S.W.2d 463, 471 (Mo.App.1997). Therefore, absent manifest error, we will not disturb the trial court's determination of custody unless the welfare of the child demands a different result. *In re Marriage of Douglas*, 870 S.W.2d 466, 469 (Mo.App.1994).

Father notes that he presented evidence unfavorable to mother as custodian, including evidence that in 1994 and 1995 Mother had expressed her desire to no longer be a wife and mother, and that in December 1996 Mother lost her job and announced to Father that she was unhappy and that she would probably file for divorce after the first of the year. Mother divided the payment of their household bills and told Father that she did not want their home and that she would probably not seek custody of Rachel. Mother then told Father that she was leaving for a trip to Chicago regarding a possible new job. However, Mother admits that she lied to Father, and instead traveled to Chicago to meet a gentleman friend with whom she was having an affair. Father also argues that Mother is emotionally unstable and potentially abusive towards Rachel, that Mother did not let him know where she was working or living, and that he feared Mother would move to another town with Rachel if she was awarded primary physical custody.

This evidence would have supported an award of custody to Father, but there was also evidence to support an award of custody to mother, including substantial evidence that Father was trying to keep Rachel and Mother apart and that Father constantly denigrated mother in front of Rachel. In addition, Mother testified that she had just paid her first month's rent for an apartment in their town and that she had started a new job and did not intend to relocate to another city anytime soon. Mother further stated that she thought Father was a good parent and that she felt it was important for Rachel to continue to have a regular relationship with him. There also was no evidence that Mother was unable to perform her primary caretaker duties, and there was substantial evidence that Mother felt it was important that Rachel participate in special activities, such as Christmas parties and visits with Santa Claus, and that she continue to have a relationship with and remain close to her extended family.

On this record, it was up to the trial court to determine the credibility of the witnesses and to determine whom to award primary physical custody, or whether to award joint custody. Considered in light of the eight factors set out above, and resolving factual conflicts in favor of the court's decision, we cannot find the court abused its discretion in awarding primary physical custody to Mother, liberal visitation to Father, and joint legal custody to both parents.

For the reasons set out above, the judgment is affirmed.

Judge ALBERT A. RIEDERER, Presiding, and Judge HAROLD L. LOWENSTEIN, concur.