

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| IN RE: THE MARRIAGE OF BRIAN L. CAMPBELL, | ) ) ) | |
| Appellant, | ) ) | WD87402 |
| v. | ) ) | OPINION FILED: |
| SHELBIE E. CAMPBELL, | ) ) | May 27, 2025 |
| Respondent. | ) ) ) | |

**Appeal from the Circuit Court of Randolph County, Missouri
Honorable David Craig Mobley, Judge**

**Before Division Four: Anthony Rex Gabbert, Chief Judge Presiding,
Janet Sutton, Judge, and James Edward Welsh, Special Judge**

Brian Campbell (Father) appeals from the amended judgment and decree of dissolution entered by the Circuit Court of Randolph County, Missouri, (trial court) which granted Shelbie Campbell (Mother) sole legal and physical custody of the minor children (the Children). Father raises two points on appeal. First, Father argues that the trial court erred in granting Mother sole physical custody of the Children and limiting Father to weekly, summer, and holiday visitation because it misapplied the law under section 452.375[1] when it rebutted a presumption of joint

---

[1] All statutory references are to the Revised Statutes of Missouri (2016) as currently updated, unless otherwise noted.

physical custody in determining that Mother having sole physical custody is in the Children's best interests. Second, Father argues that the trial court erred in finding that extended periods of contact between the Children and Father is not in the Children's best interests because the finding lacked substantial evidence in its support. Finding no error, we affirm.

**Factual and Procedural Background**

Father and Mother met in February 2015 while working at a hospital, and married in April 2016. During their marriage, the Children were born in 2017 and 2020.

At the beginning of the marriage, the parties resided in Hannibal, Missouri, and Father continued working at the hospital while attending classes to obtain his nursing license. Father resigned from the hospital after being passed over for a full-time position and he informed his superiors of his resignation by giving them a "sorry for your loss" card from the hospital gift shop. He then obtained a nursing job in Columbia, Missouri and was contracted to work the weekend shift from 1:00 p.m. to 1:00 a.m. on Friday, Saturday, and Sunday. Father commuted from Hannibal to Columbia for the first year of his employment, driving there on Friday and then returning home after his Sunday shift. After a year, Father and Mother agreed to move the family to Huntsville in Randolph County, Missouri. Mother quit her job in Hannibal two weeks after the move and stayed home with the Children.

According to Mother, Father was very jealous, controlling, and there was a lack of intimacy, even before they were married. Father installed cameras throughout the house, and Mother knew Father was monitoring her because he would send her a text message if she left a light on or get mad at her because of her phone conversations with other people. Father testified that he listened to Mother's phone conversations by way of the cameras and admitted he did so in real time. Father got very angry if Mother did not clean the house to his standards and the

2

house was not "immaculate." One time, Father returned to the house and the kitchen floor was unswept. Father became irate, throwing the kitchen chairs, and Mother shut herself and the Children in the toy room while he "flipped out."

Before their second child was born, Father would take Mother's car keys and leave her stranded at their house, which was approximately twenty minutes outside of town. A few times he also took Mother's phone, leaving her with their child and no way of contacting anyone. Father also would flatten Mother's car tires so she could not leave the house, and the neighbor would refill them for her. In one instance, Mother was pregnant with their second child and had a food craving. Father took Mother's car keys, left, and sent her a picture of him eating the food in the car.

When Mother went into labor with their second child, she told Father that she was having contractions and thought she needed to go to the hospital that night. Father told Mother that they were not going because she was scheduled for an induction at 6:00 a.m. Father went back to sleep while Mother went to the couch and waited for Father to take her to the hospital. While on the way to the hospital, Father stopped at McDonald's to get himself breakfast. By the time Mother arrived to the hospital, she was already dilated.

In July 2020, shortly after their second child was born, Mother wrote Father a letter stating that she had an affair. Mother testified, though, that this was not a sexual relationship. Father then began going on night fishing trips, leaving at 5:00 p.m. and returning the following day. According to Mother, Father later confessed after the separation that he would meet up with women and have sexual relations. Father denied ever using the trips to have an affair, but admitted to making online dating profiles and messaging other women.

Mother and Father planned a trip with the Children to Branson, Missouri, in September 2022. Mother decided she did not want to go because the "marriage was so bad," she was unhappy, they did not have the money, and Father thought she did not clean the house well enough before they left. Mother and Father got into an argument, Father took all of Mother's devices—her cellphone, Apple watch, and computer—and told her that he had thrown her phone into a nearby lake. Father also flattened Mother's tires, refilling them after Mother threatened to call the police. Mother threw Father's computer and Apple watch into the lake. Once she returned to the house, Father pulled Mother's phone out of his back pocket and "blew up" since he had not actually thrown it into the lake. Father drove to Branson by himself, and Mother later met him halfway with the Children. After Father returned, he informed Mother that he met a woman in Branson, he could see it "going places," and he did not want Mother interfering. Father and Mother separated in late-September.

After the separation, Mother and the Children moved in with Mother's mother in Hannibal and Father remained in Huntsville. Mother hired an attorney who had previously represented Father's family which upset Father, and he threatened to drag out the proceedings, call the "DFS hotline," and make the situation "very expensive for both of [them]." The parties were unable to come to an agreement and Father filed a petition for dissolution of marriage in October 2022.

Shortly after their separation, Mother and Father made a co-parenting schedule where Father had the Children from Monday morning until Thursday morning. Typically, Father would get off of work at 1:00 a.m. on Mondays and then drive to Hannibal to pick up the Children at 8:00 a.m. In December 2022, Mother and Father got into an argument because Father requested to pick up the Children halfway between Hannibal and Huntsville. When Mother said she was

unable to meet Father halfway because of work, he said he was going to get the Children from her office. Mother did not want Father to come to the office, but wanted to meet in public because of the "way he was texting [her]." Mother and Father met in a Walmart parking lot. When Father got out of the car, he had pictures of Mother's deceased father, and, while Mother was buckling the Children into Father's truck, he began "slamming [the pictures] in the back of [her] car." Mother was upset and begged him to stop. Father then came around her car, began yelling at Mother, grabbed her rearview mirror and tried snapping it off. Mother grabbed Father's rearview mirror and told him to stop or she would also break his. Father grabbed Mother and started to push her into her car. Two cars stopped to ask Mother if she needed help. Mother immediately filed a police report.

Father moved back to Hannibal three weeks before trial and the parties agreed that Father would have the Children Monday morning until Thursday evening. Mother then had the Children Thursday evening until Monday morning, with Father's mother watching the Children on Friday while Mother worked. Mother thought the schedule had worked well, but that the schedule affected their older daughter in school and that the younger daughter would also benefit from more stability during the week. Mother additionally suspected that Father was relying on his mother to watch the Children on Tuesday and Wednesday nights. On multiple days, Mother received phone calls from the older daughter's school saying daughter was not there and then Father's mother dropped her off. Father also lied about having the Children, and later admitted to lying in text messages to Mother. Mother did acknowledge that Father's mother had been very helpful.

According to Father, he did not consistently provide child support due to debts. From their separation in late-September 2022 to October 2023, Father paid Mother approximately

5

$1,800, which included $400 for a washer and dryer. Father did not provide support from June 2023 until October 2023, and promised he would pay Mother $3,000 but never did.

A bench trial was held in October 2023 during which Mother, Mother's sister (Sister), Father, and a contractor who was hired by Father (Contractor) testified. Father requested joint legal and joint physical custody with Mother. Mother requested sole legal and sole physical custody, subject to Father's visitation rights.

Sister testified that Father was "[d]egrading, manipulative, inappropriate in front of children, [and] a little demeaning." Sister indicated this occurred most times that she was around Mother and Father. Sister recalled instances where, in front of the Children, Father told Mother she was not "smart enough" to do tasks such as make coffee or fix something. One time, Father texted Sister late at night saying that Mother was a "selfish, ungrateful person," a "piece of shit," and that Mother and the Children needed to come live with Sister because they could not live with Father anymore. Sister also recalled an instance where Father was "extremely rude" to her and she became so uncomfortable that she left Mother and Father's house.

Contractor testified that Father called him in July 2023 to do electrical work on a property Father purchased in Randolph County. Father had purchased the property after the parties sold the marital home in March 2023 because, at the time, he planned to live in Huntsville and wanted the Children to attend school there. Father told Contractor that Mother was in a drug treatment facility and that she was physically abusing the Children, prompting Contractor to provide free labor. Additionally, Father disputed an invoice, claiming Contractor had double-billed him from the original quote. Contractor testified that Father attempted to do the electrical wiring in the house himself, but did so incorrectly, and then refused to bring Contractor the supplies that he needed to fix the wiring. Father threatened Contractor that if he talked to Mother

or her attorney, it would not "end well for [him]." Father also called Contractor "pathetic," and threatened to "beat [his] ass" and destroy his business. Father sold the property but still owed Contractor for his services at the time of trial.

In December 2023, the trial court entered its judgment and decree of dissolution of marriage. After hearing the testimony of witnesses and determining their credibility, and considering the exhibits presented, the trial court found that the presumption in section 452.375, that an award of equal or approximately equal parenting time is in the best interests of the Children, was rebutted by a preponderance of the evidence. The trial court entered detailed findings in accordance with all relevant factors, including, but not limited to, those contained in subdivisions (1) to (8) of section 452.375, and granted Mother sole legal and sole physical custody of the Children. Father was granted visitation with the Children one day a week, from Monday to Tuesday, holiday visitation, and summer visitation.

Father filed a motion for new trial or to amend the judgment. Father argued, *inter alia*, that the trial court erred in granting sole physical custody to Mother because it misapplied the law and its findings were against the weight of the evidence. Father also requested that the trial court amend the visitation schedule. In March 2024, the trial court entered an amended judgment and decree of dissolution of marriage which included the same detailed findings and custody determination as the initial judgment. In response to Father's request, the amended judgment changed Father's overnight visitation to Wednesday morning until Thursday morning. The amended judgment also changed the parenting plan to include a visitation schedule for all major holidays. Father then moved for a new trial or to amend the amended judgment. The trial court did not rule on the motion and it was deemed denied after ninety days by operation of Rule 81.05(a)(2)(A).

Father appeals. Additional facts relevant to the disposition of the appeal are included below as we discuss Father's two points on appeal.

**Standard of Review**

"We review a bench-tried case under the standard outlined in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)." *J.W. by K.C.G. v. N.R.W.*, 695 S.W.3d 231, 240 (Mo. App. W.D. 2024) (citation omitted). A trial court's judgment in a child custody case will be affirmed "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* (citation omitted). A not-supported-by-substantial-evidence challenge requires Father to: (1) identify a challenged factual proposition which is necessary to sustain the judgment; (2) identify all favorable evidence in the record that supports that challenged proposition; and (3) demonstrate why that favorable evidence, along with any reasonable inferences that can be drawn, does not have enough probative force upon the proposition for a trier of fact to reasonably decide that the proposition exists. *Koch v. Koch*, 584 S.W.3d 347, 355 (Mo. App. S.D. 2019) (quoting *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010)). When determining whether the trial court misapplied the law, "we review the court's legal conclusions and application of law to the facts *de novo*." *Cullen v. Bernstein*, 694 S.W.3d 494, 498 (Mo. App. E.D. 2024). There is reversible error if a misapplication of the law "materially affects the merits of the action such that we have a firm belief the judgment is wrong." *Id.*

Family law cases "often require the trial court to weigh a great deal of conflicting evidence before finding the highly subjective facts required by the applicable statutory factors." *Ivie v. Smith*, 439 S.W.3d 189, 199 n.9 (Mo. banc 2014). We defer to the trial court's credibility determinations, presuming that the trial court reviewed all the evidence and based its decision on

the children's best interests. *J.W.*, 695 S.W.3d at 241 (citation omitted). "We will not disturb a custody ruling unless we are firmly convinced that the welfare of the child requires some other disposition." *Id.* (citation omitted). So long as there is credible evidence supporting the trial court's beliefs, we will not substitute our judgment for that of the trial court. *Cox v. Cox*, 504 S.W.3d 212, 221 (Mo. App. W.D. 2016) (citation omitted).

## Legal Analysis

Father raises two points on appeal. For ease of analysis, we address the points in the reverse order of their presentation in Father's brief.

### *Point Two*

In Father's second point on appeal, he argues that the trial court erred in finding that extended periods of contact between the Children and Father is not in their best interests, and that this finding was necessary to sustain the judgment but that it lacked substantial evidence in its support. Father argues that sole physical custody under section 452.375 is only appropriate where there is evidence of withholding visitation, substance abuse, or abuse or neglect of the child and that evidence of bad behavior directed at the other parent is not probative or substantial. We disagree.

Under section 452.375.2, there is a rebuttable presumption that equal or approximately equal parenting time is in the best interests of the children. The presumption can be rebutted only by a preponderance of the evidence based on all relevant factors including, but not limited to, the factors in subdivisions (1) through (8):

> (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

> (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community. . . . ;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. . . . ;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The unobstructed input of a child, free of coercion and manipulation, as to the child's custodial arrangement.

§ 452.375.2.

Missouri law requires that a trial court address all relevant factors under section 452.375.2(1)-(8) and enter written findings as to those relevant to the case. *See Merriweather v. Chacon*, 639 S.W.3d 494, 500 (Mo. App. E.D. 2021). A factor's relevance to the custody decision is dictated by the evidence. *Von Holten v. Estes*, 512 S.W.3d 759, 764-65 (Mo. App. W.D. 2017) (quoting *Soehlke v. Soehlke*, 398 S.W.3d 10, 20 (Mo. banc 2013)).

The trial court included the following discussion of the section 452.375 factors in its amended judgment. First, considering the wishes of the Children's parents, Father requested joint legal and joint physical custody and Mother requested sole legal and sole physical custody, subject to Father's visitation. Father was very controlling and manipulative of Mother, with such behavior often occurring in front of the Children, as evidenced by Father placing video monitors throughout the house to watch and listen to Mother while he worked; checking Mother's phone to see how much time she spent on it, what websites she visited, and who she had spoken to; withholding intimacy if the house was not clean enough when he returned from work; taking her keys and laptop away; refusing to let her go out with friends; and getting angry if the house was

10

not immaculate. Mother testified that Father told her he had "given [her] this life," and that she "should be grateful," that Father flattened her tires to prevent her from leaving the house, and that Father texted her saying he would not agree to the Children attending school in Hannibal because it would hurt his case. The trial court found Mother to be credible and that such behavior often occurred in front of the Children.

Furthermore, the trial court found Father was emotionally abusive to Mother, at times in front of the Children, calling her disrespectful names and telling her she was not smart enough to do certain things. The trial court found Mother, Sister, and Contractor to be credible, and found Father to be evasive, and that he did not follow the court's instructions concerning answering the questions. In light of Father's attitudes and behaviors, in addition to his work schedule, the trial court found that neither joint legal nor joint physical custody was in the Children's best interests, whereas it found Mother's parenting to be commendable and appropriate.

Second, considering the Children's need for a relationship with both parents and the parents' ability to perform their parental functions, the trial court found that "Father undeniably loves the [C]hildren, but based on the findings [under the first factor], specifically, the way he belittled Mother, sought to control her behaviors, used intimidation and attempted to humiliate her and undermine her, often with the [Children] present," limited time with Father was in their best interests. The trial court found that Mother understands the importance of the Children having a relationship with their Father.

Third, considering the Children's interactions with their parents and other persons affecting their best interests, Father resided in Huntsville for thirteen months after the separation, where there were no other individuals significantly affecting the Children's best interests. Father began renovating a house in Huntsville, which was not safe or appropriate for the Children and

11

never completed, and wanted to enroll the Children in a Randolph County school. Father only moved back to Hannibal three weeks before the trial, whereas Mother moved the Children to Hannibal where the family had previously resided and Father's mother is located. The trial court found that Mother values the Children's relationship with Father's mother and that the Children have an "irrefutably good" relationship with Mother.

Fourth, considering which parent appears more likely to allow contact with the other parent, the trial court found that Father's parenting plan allowed for frequent, continuing, and meaningful contact with Mother, but based on all factors as discussed in the judgment, extended contact with Father was not in the Children's best interests. The trial court noted Father's text messages to Mother in which he threatened to drag out the case until she ran out of money and Father got the Children.

Fifth, considering the Children's adjustment to their home, school, and community, the Children have resided in Hannibal since the separation and are well-adjusted. Therefore, the trial court found that Mother's home provided a stable, functional, and nurturing environment where the Children have flourished, whereas Father's home and lifestyle was chaotic and unstable.

Sixth, considering the mental and physical health of all individuals involved and any history of abuse, there was no evidence of any physical health issues or any history of physical abuse. However, the trial court was concerned about Father's understanding of his comments and behavior in front of the Children, Mother, his coworkers and superiors, his prior attorney, Contractor, females in Mother's family, and the trial court. The trial court relied on credible testimony from Mother and the court's own observations and interactions with Father during the trial.

Seventh, considering either parent's intention to relocate the Children's principal residence, neither parent testified as to any intention to relocate the Children.

Eighth, considering the Children's wishes, the Children did not testify because they were three and five years old at the time of trial.

In his not-supported-by-substantial-evidence challenge, Father challenges the factual proposition that extended periods of contact with Father is not in the Children's best interests. Father argues that because Mother's evidence of emotional abuse, and other negative evidence of his behavior, was not directed at Children, it is not favorable to and does not have probative force to support Mother's award of sole physical custody. In effect, Father argues that the only favorable evidence supporting the challenged proposition (e.g., his work schedule; deficient child support; moving back to Hannibal only three weeks before trial; Father's mother watching the Children) does not have enough probative force to conclude that extended contact with Father is against the Children's best interests.

Citing to *Gant v. Gant*, 923 S.W.2d 527 (Mo. App. W.D. 1996), Father asserts that Mother's evidence of him monitoring her with cameras, emotionally abusing her, and arguing with other adults is irrelevant to Father's relationship with the Children, or his ability to provide for them, because there is no evidence that the incidents were directed at the Children. Father cites *Gant* for the proposition that, *as a matter of law*, because these actions were not directed at the Children they cannot support the best interest finding. This is an incorrect recitation of *Gant's* holding. In *Gant*, wife testified that husband was violent and emotionally unstable, damaged items during fits of rage, and sometimes grabbed or smacked her during arguments. *Id.* at 528. Wife claimed that husband had grabbed her face and pushed her over the arm of a couch when she was holding her six-month-old baby, husband threatened to kill her ten to twelve times,

13

husband was physically violent with at least three other men before and during the marriage, and that husband raped her numerous times. *Id.* at 529. Husband admitted that he only once told wife she sometimes made him want to kill her, denied raping wife, and testified that he changed and admitted that his past behavior was childish. *Id.* Father testified that during the marriage he typically cleaned and cooked, and that he was concerned about how wife handled the children's hygiene as they would not be bathed for days and would often have colds, ear infections, or diaper rashes after visiting wife. *Id.* The nanny also testified the children were sick after visiting wife and that the children's interests would be best served if husband had primary physical custody. *Id.*

The trial court found that domestic violence had occurred but husband had changed and became less violent or able to control his temper, and physical custody should be awarded to husband because the violence was not recent, nor was it ever directed at the children. *Id.* at 529-30. Of import, this finding was made after remand from this Court directing the trial court to make specific findings on domestic violence pursuant to section 452.375.2(5)[2] since the trial court was awarding custody to the offending parent. *Id.* On appeal, we agreed that instances of domestic violence are to be given importance, but we found that we could not "codify the weight to be given the various factors. What is needed is a reasonable decision in light of all the relevant factors, giving substantial weight to domestic violence and any other factor affecting the welfare of the children." *Id.* at 530. Therefore, given the trial court's consideration of all section 452.375.2 factors, including the evidence of domestic violence and the wife's unfitness to care

[2] Section 452.375.2 has since been amended, however, subdivision (6) still instructs that if the court "finds that a pattern of domestic violence as defined in section 455.010 has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law."

14

for the children, we affirmed the trial court's judgment as the trial court may have been "significantly influenced" by the nanny's and husband's testimony concerning his attention to the children's needs and wife's lack thereof. *Id.* at 531.

*Gant* illustrates the trial court's necessity to consider *all* relevant section 452.375.2 factors, and our deference to its beliefs and credibility findings. *See Merriweather*, 639 S.W.3d at 500; *Cox*, 504 S.W.3d at 221. Despite considering husband's abusive history in *Gant*, the trial court still awarded him sole physical custody because it placed more weight on wife's inability to care for the children. *Gant*, 923 S.W.2d at 530-31. In contrast, here, the trial court found that Mother—unlike Father—was "actively involved with the [C]hildren and has provided a loving, safe and nurturing environment for the [C]hildren." Also, unlike in *Gant*, the trial court found Mother's parenting, during and after the marriage, to be "commendable and appropriate." We note that *Gant* is also not analogous because, there, we deferred to the trial court's findings and affirmed its custody determination whereas, here, Father requests that we disregard the trial court's findings and reverse its custody determination. *See id.* at 531.

In addition to *Gant*, Father claims other case law supports his argument that his emotional abuse of Mother is irrelevant to his relationship with the Children and, therefore, is not favorable evidence supporting his limited contact with the Children. *See Halford v. Halford*, 292 S.W.3d 536, 539, 546 (Mo. App. S.D. 2009) (directing the trial court to grant sole legal and sole physical custody of the children to father due to an ambiguity in the trial court's physical custody award); *In re Marriage of Sutton*, 233 S.W.3d 786, 794 (Mo. App. E.D. 2007) (reversing in part and remanding with instructions to make an award of sole legal custody to one of the parties in accord with the children's best interests).

In *Halford*, there was evidence of father's temper and physical conduct toward mother in front of the minor children, but the trial court found that they were isolated incidents that occurred after father discovered mother had a relationship with another man. 292 S.W.3d at 542. The trial court in *Halford* also found that mother had a ten-year affair and specifically misrepresented to the man and minor children that he was the biological father, prompting him to pay child support; had a separate affair with a man who mother and children lived with before the marriage was dissolved; and there was evidence mother intentionally interfered with father's relationship with children. *Id.* at 541-42. The Southern District, while not condoning father's behavior, concluded that the trial court could have inferred that the "fits of jealous anger would be less likely to occur once he had determined that the marriage could not be preserved." *Id.* at 542. Pointing to *Halford*, Father asserts that his monitoring of Mother with cameras is not evidence in favor of Mother receiving sole physical custody because the "behavior could not continue with the parties separated" when Mother only stated the behavior occurred during the marriage. But, again, section 452.375.2 requires a trial court to consider *all* relevant factors, not just one, and the *Halford* trial court clearly placed emphasis on mother's extra-marital affairs and interference with father's parenting, whereas the trial court here found Mother's parenting to be "commendable and appropriate."

In *Sutton*, the trial court found that there was substantial evidence in the record supporting the parties' inability to interact with each other without acrimony, make joint decisions about the children, and notify one another about decisions made. 233 S.W.3d at 792. There was also evidence of the parents subjecting the children to bickering and criticism of one another. *Id.* Because there was no basis for concluding the parents could function as a unit and because the trial court's award of joint legal custody was not supported by substantial evidence,

16

the judgment was reversed and remanded. *Id.* at 793. Father cites *Sutton* to support his assertion that his attitude and behavior towards Mother "would only be probative when determining the *legal* custody of the Children, which turns on whether the parties can get along enough to make joint decisions." It is disingenuous of Father to suggest *Sutton* stands for such a proposition. Legal custody was the *only* custody type addressed on appeal in *Sutton*. *Id.* at 788-89. "Primary" physical custody had already been granted to mother and was not at issue on appeal.[3] *Id. Sutton* merely explains that we consider the parties' ability to function as a parental unit, among other factors, when determining whether joint legal custody is in the children's best interests. *Id.* at 790. By no means does *Sutton* limit the relevance of one parent's behavior towards the other parent to legal custody determinations.

Contrary to Father's erroneous assertion that his behavior is only probative to legal custody determinations, a trial court can rebut the presumption of equal parenting time by considering "*all* relevant factors, including, *but not limited to*, the factors contained in subdivisions (1) to (8) of th[e] subsection." § 452.375.2 (emphasis added). And case law illustrates that a parent's attitude or behavior towards the other parent can be considered when determining physical custody. *See, e.g.*, *Sarwar v. Sarwar*, 117 S.W.3d 165, 169-70 (Mo. App. W.D. 2003) (discussing father's emotional and physical abuse and isolation of wife from her family before concluding that the trial court did not err in awarding a greater share of physical

---

[3] Missouri statutes do not provide for an award of "primary custody." Section 452.375.1(1) defines "custody" as "joint legal custody, sole legal custody, joint physical custody or sole physical custody or any combination thereof[.]" The statute does not use the term "primary physical custody." *See In re Marriage of Sutton*, 233 S.W.3d 786, 789 (Mo. App. E.D. 2007). The trial court awarded the majority of physical time to mother, labeling it "primary physical custody." *See id.*

custody to mother);[4] *Chapin v. Chapin*, 985 S.W.2d 897, 902 (Mo. App. W.D. 1999) (declining to find the trial court abused its discretion in awarding primary physical custody to mother and citing, among other evidence, father's constant denigration of mother in front of daughter).

After reviewing the record and the trial court's consideration of all the section 452.375.2 factors and the evidence presented, we find that the award of sole physical and sole legal custody to Mother was supported by substantial evidence. The trial court properly considered Father's work schedule, failure to pay child support, his move back to Hannibal only three weeks before trial, Father's mother watching the Children, and his emotional abuse of Mother to determine that extended time with Father was not in the Children's best interests. Because the trial court's conclusion that extended time with Father was not in the Children's best interests is supported by substantial and credible evidence, we defer to its judgment. *See Cox*, 504 S.W.3d at 221 (citation omitted).

Point Two is denied.

---

[4] Father cites *Sarwar v. Sarwar*, 117 S.W.3d 165, 169-70 (Mo. App. W.D. 2003), in support of his argument that we have continually found joint physical custody is proper—and sole physical custody is not required—despite a finding that one parent physically or emotionally abused the other parent. This is a flawed interpretation of *Sarwar*. We note that Father misstates the facts of *Sarwar*. In his brief, Father states that we affirmed the award of joint physical custody, however, the opinion clearly states that the trial court awarded joint legal and physical custody, with mother to have "primary physical custody" and father to have parenting time as set forth in the Guardian Ad Litem's parenting plan. *Id.* at 167. We additionally explained that "primary physical custody" is a misnomer because section 452.375.1(1) makes no mention of such and, thus, we discerned that the trial court used the word "primary" to denote that despite awarding joint physical custody, mother would have a greater share of physical custody. *Id.* at 167 n.2. The proper question on appeal was, therefore, "whether the trial court erred in awarding a greater share of physical custody to [mother]." *Id.* On appeal, we affirmed the award granting mother "primary physical custody," or, in other words, the majority of parenting time, based in part on father's abuse of mother. *Id.* at 169-70.

## *Point One*

In his first point on appeal, Father asserts that the trial court misapplied the law in granting Mother sole physical custody of Children because, under the presumption in section 452.375, it is in the Children's best interests for Mother to have joint physical custody with Father. Father argues the trial court found there was no physical abuse or neglect of the Children, but based its order rebutting that presumption on Father and Mother's relationship and Father's work schedule, misapplying the law by doing so. We find this to be simply another sufficiency of the evidence argument, couched in other terms.

Citing to case law, including *Gant*, *Halford*, and *Sarwar*, as addressed *supra*, Father asserts that this Court has continually held that joint physical custody is proper despite a finding that a parent abused the other. For the reasons stated above, we disagree with Father's interpretation of *Gant*, *Halford*, and *Sarwar*, and we similarly find his reliance on additional case law to be misplaced.

Father relies on *Cooley v. Cooley*, 131 S.W.3d 901 (Mo. App. W.D. 2004), and *Loumiet v. Loumiet*, 103 S.W.3d 332 (Mo. App. W.D. 2003), however, both are crucially different to the current matter. Both mothers in *Cooley* and *Loumiet* argued that the trial court's awards of primary and joint physical custody, respectively, to the fathers were against the weight of the evidence because the fathers abused them. *Cooley*, 131 S.W.3d at 903; *Loumiet*, 103 S.W.3d at 336, 340-41. Despite recognizing that abuse was an important factor to consider, we deferred to the trial court's findings and affirmed both physical custody awards to father. *Cooley*, 131 S.W.3d at 903, 906; *Loumiet*, 103 S.W.3d at 341-42. In contrast, here, Father is requesting that we disregard the trial court's factual and credibility findings and reverse the physical custody award.

Importantly, *Cooley* and *Loumiet* are also distinguishable because both trial courts issued findings regarding the mothers' parenting abilities that weighed against them. *See Cooley*, 131 S.W.3d at 904; *Loumiet*, 103 S.W.3d at 341-42. In *Cooley*, mother, who had volunteered for overseas military services, had not maintained a stable residence and did not have a bedroom for the child, while several witnesses testified that father was a good parent who "d[id] everything" for child and performed most of the household duties. 131 S.W.3d at 904-05. The trial court found one instance of domestic violence where father hit mother. *Id.* at 903. *Cooley* states: "[D]omestic violence is an important factor to consider . . . [and] is simply a factor to be weighed by the trial court with all the other relevant factors . . . in making its award of physical custody." *Id.* (internal quotation and citation omitted). In *Loumiet*, there was "extensive evidence" of mother's lack of parenting skills, including an inability to get the children to school on time which impacted their grades, traveling around the country to attend concerts even though the gas in her house was turned off for failure to pay the bill, and frequently chatting online with teenagers and traveling to meet up with them. 103 S.W.3d at 341-42. The trial court found that father had committed three acts of domestic violence against mother, but that no pattern of domestic violence existed. *Id.* at 335. Again, on appeal, we stated that the trial court must consider evidence of domestic violence in light of all other relevant factors. *Id.* at 341. Here, the trial court did not issue findings that weighed against Mother's ability to parent the Children, instead, finding that her parenting during the marriage and separation was "commendable and appropriate" because she "provided a loving, safe and nurturing environment for the [C]hildren."

Last, we address Father's reliance on *In re Marriage of Harris*, 154 S.W.3d 456 (Mo. App. S.D. 2005), and *Purdun v. Purdun*, 163 S.W.3d 598 (Mo. App. W.D. 2005), to support his assertion that an award of sole physical custody to one parent is generally only proper when the

other parent denied the custodial parent visitation, the non-custodial parent abused or neglected the children, or they have pertinent issues like substance abuse problems. Neither *Harris* nor *Purdun* stand for this proposition. In *Harris,* father attacked a joint physical custody finding. 154 S.W.3d at 460. Father argued the trial court erred in not granting him sole physical custody because he was a suitable physical custodian and mother had denied father visitation, had deficient morals, and poor mental health, including a substance abuse problem. *Id.* at 457, 461. The Southern District found father's argument ignored evidence of his drinking, violent temper, physical and mental abuse of mother, and inappropriate behavior in front of daughter, and the court concluded that the trial court did not err in denying father's request for sole physical custody. *Id.* at 461. In *Purdun,* the court treated mother's continuing substance abuse, which created a danger to the children, as a significant factor, and noted that a parent's history of denying the other parent meaningful contact may be considered as well. 163 S.W.3d at 601-02.

Section 452.375.2 specifically instructs a trial court to consider *all* relevant factors, not only those contained in subdivisions (1) through (8). And as evidenced by our discussions *supra*, child custody determinations are fact-specific inquiries that are based on the trial court's review of all the evidence, its credibility determinations, and its decision as to what is in the children's best interests. *See, e.g.*, *S.K.B.-G. ex rel. J.P.G. v. A.M.G.*, 532 S.W.3d 231, 238 (Mo. App. E.D. 2017) (explaining mother's contention that an award of equal physical custody is, as a matter of law, "generally not in the best interests of the child" lacks merit because, although mother cited two cases finding that equal physical custody were not in the best interests of the children, "such cases were fact-specific and the opinions do not suggest this arrangement is disfavored in the law"). Father cannot cherry pick a case which addresses section 452.375.2 factors based on the factual circumstances of that particular case to then argue that only those specific circumstances

provide the basis for an award of sole physical custody. Child custody determinations are a fact-specific inquiry, justifying our need to defer to the trial court's determination. *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 627 (Mo. banc 2014) (citation omitted) ("The trial court receives deference on factual issues because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.").

Based on the trial court's discussion of all relevant factors in accordance with section 452.375.2, the trial court did not misapply the law because the evidence adduced at trial was sufficient to rebut the presumption that equal or approximately equal parenting time is in the best interests of the Children. The evidence weighing against Father included his:

> [A]ttitudes and behaviors, often in front of the [C]hildren, both being female, often were belittling of women both in conversation and demeanor, that he attempts to control Mother's behaviors and often used intimidating behavior in an attempt to destroy Mother's self-confidence and to undermine her. Due to Father's work schedule in Columbia and his history of recurrent inappropriate verbal, emotional, and mental abuse of Mother in the presence of the minor [C]hildren, his manipulation of Mother and open and utter disrespect for Mother, his irrational outbursts and threats to [M]other and anyone opposing him, his lack of financial support for the [C]hildren during the pendency of th[e] matter, his evasiveness and lack of credibility under oath, the [trial court found] that neither joint legal nor joint physical custody is in the best interest of the [C]hildren[.]

On the contrary, the trial court did not make any findings that weighed against Mother and also found her to be credible. The trial court did not err in specifically finding the presumption in section 452.375 to be rebutted in accordance with the evidence on *all* relevant factors.

Point One is denied.

## Conclusion

The trial court's judgment is affirmed.

                                   _Janet Sutton_

Janet Sutton, Judge

Anthony Rex Gabbert, C.J., and James Edward Welsh, Sp. J. concur.